## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

Gregory Lambert, as Administrator
of the Estate of Harrison Lambert

     v.                         Case No. 17-cv-404-AJ
                                    Opinion No. 2019 DNH 053

Town of Merrimack, et al.


## MEMORANDUM ORDER

On September 3, 2015, two Merrimack police officers shot and killed Harrison Lambert while responding to a domestic disturbance at his home.  Lambert's father, Gregory Lambert, brings this action as administrator of his son's estate, alleging that the officers violated Lambert's Fourth Amendment right to be free from excessive force and that the Town of Merrimack violated the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act by failing to accommodate Lambert's known mental disability. The Estate also brings several state-law claims against all three defendants.  The case was assigned to the undersigned magistrate judge, to whose jurisdiction the parties consented.  See doc. no. 2; see also 28 U.S.C. § 636(c).

The defendants move for summary judgment on all counts, alternatively arguing that they did not violate Lambert's rights and that, even if they did, they are immune from suit.  See doc. no. 12.  While the Estate concedes summary judgment on the

state-law claims, it contends that factual disputes in the record require that the federal claims be put to a jury.  See doc. no. 19.  The court heard oral argument in October 2018.

The court grants the defendants' motion as to the Fourth Amendment claim.  Even assuming the officers' conduct constituted excessive force, the Estate has not demonstrated that the unlawfulness of that conduct was clearly established at the time of the shooting.  The officers are therefore entitled to qualified immunity, and the court dismisses them from this action.

Based on recent controlling authority, however, the court concludes that summary judgment is not appropriate on the ADA and Section 504 claim, at least on the state of the present briefing.  The court accordingly denies the defendants' motion without prejudice as to that claim, but grants the Town 45 days to file a renewed motion, as may be appropriate, taking into account these recent legal developments.

## I.    LEGAL STANDARD

Summary judgment is appropriate where the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "If a nonmovant bears the ultimate burden of proof on a given issue, she must present 'definite,

competent evidence' sufficient to establish the elements of her claim in order to survive a motion for summary judgment." Pina v. Children's Place, 740 F.3d 785, 795–96 (1st Cir. 2014) (quoting Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991)). The court must "draw all reasonable inferences from the record in the light most favorable to the nonmoving party, disregarding any 'conclusory allegations, improbable inferences, or unsupported speculation.'" McGrath v. Tavares, 757 F.3d 20, 25 (1st Cir. 2014) (quoting Alicea v. Machete Music, 744 F.3d 773, 778 (1st Cir. 2014)).

## II. BACKGROUND

On September 3, 2015, at around 12:15 p.m., Master Patrolman Richard McKenzie of the Merrimack Police Department was at the police station working on reports when he received a radio from dispatch regarding a domestic incident at 8 Joppa Road in Merrimack. Doc. no. 12-17 ¶ 4. Dispatch indicated that the incident involved a man with a knife. Id. ¶ 3; doc. no. 12-2 ¶ 6. McKenzie left the police station, entered a fully marked police SUV, and radioed that he would respond to the scene. Doc. no. 12-17 ¶ 4.

Lieutenant Matthew Tarleton and Master Patrolman William Gudzinowicz also heard the dispatch. Doc. no. 12-2 ¶¶ 5, 6; doc. no. 12-10 ¶ 5. Scheduled to co-teach a training session at

3

1:00 p.m., Tarleton and Gudzinowicz had just entered a fully marked police cruiser in the police station parking lot when the dispatch came through. Doc. no. 12-2 ¶¶ 5, 6; doc. no. 12-10 ¶ 5. Tarleton, who was in the driver's seat, saw McKenzie enter the SUV and leave for the scene. Doc. no. 12-2 ¶ 7. With Gudzinowicz in the passenger's seat, Tarleton pulled the cruiser behind the SUV and followed McKenzie to 8 Joppa Road. Id. ¶ 7; doc. no. 12-10 ¶ 5.

McKenzie was on patrol duty when he received the call and was wearing a full patrol uniform and a duty belt, on which he carried a .40 caliber pistol, a radio, two magazines, and a Taser. Doc. no. 12-17 ¶ 2. Tarleton and Gudzinowicz wore training uniforms consisting of navy-blue collared shirts displaying the Merrimack Police Department badge insignia and their last names, with the department badge on the shoulders. Doc. no. 12-2 ¶ 3; doc. no. 12-10 ¶ 3. Gudzinowicz also wore a Merrimack Police Department baseball cap. Doc. no. 12-10 ¶ 3. Because they were dressed for training and not patrol duty, Tarleton and Gudzinowicz only carried .40 caliber pistols on their service belts, and not Tasers or other tactical gear. Doc. no. 12-2 ¶ 4; doc. no. 12-10 ¶ 4.

The officers reached the scene in a matter of minutes. Doc. no. 12-17 ¶ 5; see also doc. no. 12-2 ¶ 8. McKenzie parked the SUV on the right side of the street with 8 Joppa Road ahead

of him on the right.  See doc. no. 12-6 at 3; doc. no. 12-13 at 3; doc. no. 12-21 at 3.  Tarleton parked the cruiser behind McKenzie's SUV.  Doc. no. 12-2 ¶ 9; doc. no. 12-10 ¶ 6; doc. no. 12-17 ¶ 5.  McKenzie exited his vehicle first and identified Harrison Lambert standing about 15 yards from him.[1]  Doc. no. 12-17 ¶ 6.  Initially unable to see a knife, McKenzie shouted at Lambert to show his hands.  Id. ¶ 7.  Lambert did not obey and shouted expletives at the officers.  Id.; doc. no. 12-2 ¶ 11.

Due to Lambert's behavior, and because dispatch had reported an incident involving a knife, McKenzie unholstered his service weapon.  Doc. no. 12-17 ¶ 7.  At around this time, Tarleton exited the cruiser and saw Lambert standing at the end of the driveway to 8 Joppa Road, approximately 30 yards from him.  Doc. no. 12-2 ¶ 10.  Lambert started walking diagonally away from the officers.  Doc. no. 12-2 ¶ 11.  He then turned back, at which point McKenzie observed a knife in his hand. Doc. no. 12-17 ¶ 8.  McKenzie shouted at Lambert to "drop the knife!"  Id. ¶ 9.  When McKenzie shouted, Tarleton also noticed the knife.  Doc. no. 12-2 ¶ 12.  Tarleton, too, started yelling at Lambert to stop and drop the knife.  Id. ¶ 12.

---

[1] All three officers had prior police-related contact with Lambert and were familiar with his appearance.  Doc. no. 12-2 at 2 n. 1; doc. no. 12-10 at 2 n. 1.; doc. no. 12-17 at 2 n. 1.

Gudzinowicz was exiting the cruiser when he heard McKenzie order Lambert to drop the knife. Doc. no. 12-10 ¶ 7. Gudzinowicz walked in front of the cruiser and observed Lambert standing at the end of the driveway with a knife in his right hand. Id. ¶¶ 7, 8. Gudzinowicz also shouted at Lambert to drop the knife. Id. ¶ 8. When Lambert did not comply, Tarleton and Gudzinowicz unholstered their service weapons. Id. ¶¶ 8, 9; doc. no. 12-2 ¶ 12. At that time, Gudzinowicz was in the middle of the three officers, with Tarleton to his immediate left and McKenzie ahead and to his right. Doc. no. 12-10 ¶ 8; doc. no. 12-17 ¶ 10. Lambert was approximately 30 yards from Tarleton and 15 to 20 yards from Gudzinowicz. Doc. no. 12-2 ¶ 13; doc. no. 12-10 ¶ 8.

After briefly pacing back and forth, Lambert turned and started running at the officers in a zig-zagging fashion. Doc. no. 12-2 ¶ 14; doc. no. 12-10 ¶¶ 9, 10; doc. no. 12-17 ¶ 11. As he ran, Lambert held the knife at his side with the blade pointing forward. Doc. no. 12-2 ¶ 14; doc. no. 12-10 ¶ 10. The officers commanded Lambert to stop and drop the knife. Doc. no. 12-2 ¶ 14; doc. no. 12-10 ¶ 11; doc. no. 12-17 ¶ 11. Lambert turned suddenly and ran directly at Tarleton. Doc. no. 12-2 ¶ 15; doc. no. 12-10 ¶ 11; doc. no. 12-17 ¶ 11. The officers continued to shout at Lambert to stop and drop the knife. Doc. no. 12-2 ¶ 17; doc. no. 12-10 ¶ 11; doc. no. 12-17 ¶ 11. When

Lambert did not obey, Tarleton and Gudzinowicz opened fire.
Doc. no. 12-2 ¶ 19; doc. no. 12-10 ¶ 14; doc. no. 12-17 ¶ 13.
Tarleton fired three shots and Gudzinowicz fired five.  Doc. no.
12-2 ¶ 19; doc. no. 12-10 ¶ 15.  McKenzie did not fire at
Lambert out of concerns for collateral damage.  Doc. no. 12-17
¶ 13.  McKenzie recalls hearing Tarleton and Gudzinowicz fire
the shots in quick succession.  Id. ¶ 13.  A recording of a 911
call with Lambert's father, in which the shots can be heard in
the background, supports McKenzie's recollection.  See doc. no.
12-28 at 4:35 (conventionally filed).

There is inconsistent evidence in the record as to how far
Lambert was from the officers when they opened fire.
Gudzinowicz says he pulled the trigger when Lambert was 12 to 15
feet from him and Tarleton.  Doc. no. 12-2 ¶ 14.  McKenzie
similarly states that Lambert was about 15 feet from Gudzinowicz
and Tarleton when he heard them open fire.  Doc. no. 12-17 ¶ 13.
In contrast, Tarleton stated in his interview with New Hampshire
State Police on the day of the incident that he fired his weapon
when Lambert was 10 to 15 yards away.  See doc. no. 12-6 at 8,
36.  But in an affidavit filed in support of the defendants'
motion, Tarleton contends that this was a misstatement and that
Lambert was in fact 10 to 15 feet away when he discharged his
weapon.  Doc. no. 12-2 ¶¶ 19, 19 n. 2.

Less than 30 seconds elapsed between the time the officers exited their vehicles and the time the shots were fired. Doc. no. 12-10 ¶ 15; doc. no. 12-17 ¶ 14.[2] Lambert was struck by five bullets. Doc. no. 12-5 at 15. He ultimately died from his injuries. Id.

## III. DISCUSSION

The Estate's complaint consists of five claims, two federal and three state. In a claim brought under 42 U.S.C. § 1983, the Estate alleges that Tarleton and Gudzinowicz subjected Lambert to excessive force in violation of the Fourth Amendment. The Estate also alleges that the Town violated the ADA and Section 504 by failing to accommodate Lambert's known mental disability.[3] And against all three defendants, the Estate alleges state-law claims of assault, battery, and wrongful death.

---

[2] The Estate contends that this fact is disputed because an eyewitness, Laura Ploss, stated in an interview with the New Hampshire State Police that the two officers discharged their weapons six or seven seconds after they exited their cruisers. See doc. no. 19 at 2. The court addresses this contention below. See infra pp. 15-16.

[3] The Estate refers to this claim as its "ADA" claim, despite being brought under both the ADA and Section 504. See doc. no. 19 at 16 n.4. The court does likewise in this order. See Parker v. Universidad de P.R., 225 F.3d 1, 4 n.2 (1st Cir. 2000) (noting that Title II of the ADA "essentially extends the reach of [Section] 504 to state and local governmental entities that do not receive federal financial assistance").

The defendants move for summary judgment on all claims. At the hearing, the Estate conceded summary judgment on the state-law claims. The court accordingly grants the defendants' motion as to those claims. The Estate opposes summary judgment on the federal claims. The court addresses those claims in order

## A.    Excessive force

The defendants contend that summary judgment is appropriate on the excessive-force claim both because the officers' use of force was justified under the circumstances and because the officers are entitled to qualified immunity. The court need not address the defendants' first argument because even assuming the officers' use of force was excessive, qualified immunity shields both officers from liability. The court limits its analysis accordingly.

Police officers "are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" Dist. of Columbia v. Wesby, 138 S. Ct. 577, 589 (2018) (citation omitted). "Although this description implies a set sequence, these prongs need not be taken in order." Conlogue v. Hamilton, 906 F.3d 150, 155 (1st Cir. 2018) (internal quotation and citation omitted). "A court is well within its authority to alter the choreography in the interests of efficiency[,] beginning — and perhaps ending —

with the second prong." Id. (same omissions).  In this case,
the second prong is dispositive.

"Clearly established means that, at the time of the
officer's conduct, the law was sufficiently clear that every
reasonable official would understand that what he is doing is
unlawful." Wesby, 138 S. Ct. at 589 (citations and internal
quotation marks omitted).  Put differently, "existing law must
have placed the constitutionality of the officer's conduct
beyond debate." Id. (citation and internal quotation marks
omitted).  "This demanding standard protects all by the plainly
incompetent or those who knowingly violate the law." Id.
(citation and internal quotation marks omitted).

Where, as here, the movant raises a qualified immunity
defense, the nonmoving party has the burden of demonstrating
that the law was clearly established during the relevant time
period.  See Mitchell v. Miller, 790 F.3d 73, 77 (1st. Cir.
2015).  The First Circuit has held that this inquiry has two
facets. Conlogue, 906 F.3d at 155.  "First, the plaintiff must
identify either controlling authority or a consensus of
persuasive authority sufficient to put an officer on notice that
his conduct fell short of the constitutional norm." Id.
(citation omitted).  A plaintiff must also "show that an
objectively reasonable officer would have known that his conduct
violated the law." Id. (citation omitted).  "Because many law

enforcement encounters arise from confusing, high-stakes circumstances, this second inquiry provides some breathing room for a police officer even if he has made a mistake (albeit a reasonable one) about the lawfulness of his conduct."  Id. (citation omitted).  In other words, "[t]he precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." Wesby, 138 S. Ct. at 590 (citation omitted).

"Taken together, these steps normally require that, to defeat a police officer's qualified immunity defense, a plaintiff must identify a case where an officer acting under similar circumstances was held to have violated the Fourth Amendment."  Gray v. Cummings, 917 F.3d 1, 10 (1st Cir. 2019) (internal quotation marks omitted) (quoting City of Escondido v. Emmons, 139 S. Ct. 500, 504 (2019)).  "Although such a case need not arise on identical facts, it must be sufficiently analogous to make pellucid to an objectively reasonable officer the unlawfulness of his actions."  Id. (citations omitted).  The Supreme Court has stressed that courts "must not define clearly established rights at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced."  Wesby, 138 S. Ct. at 590 (citations and internal quotation marks omitted).  While "there can be the rare 'obvious

case,' where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances . . . , a body of relevant case law is usually necessary to clearly establish the answer." Id. (citations, internal quotations, and brackets omitted).

Construed generously, the Estate's objection contains citations to six decisions bearing on the clearly established prong of qualified immunity. None would have put Tarleton or Gudzinowicz on notice that his conduct violated the Fourth Amendment. Three of the decisions do not involve excessive force at all, and therefore have little relevance to the specific facts in this case.[4] Another, a landmark decision in which the Supreme Court concluded that excessive-force claims against law enforcement are properly analyzed under the Fourth Amendment's "objective reasonableness" standard, is readily distinguishable from this case on its facts. See Graham v.

_____

[4] These cases are Albright v. Oliver, 510 U.S. 266, 268 (1994), which addressed whether a substantive right exists under the Fourteenth Amendment's Due Process Clause to be free from criminal prosecution except upon probable cause, Maldonado v. Fontanes, 568 F.3d 263, 266 (1st Cir. 2009), which assessed whether the seizure and destruction of pets owned by residents of three public housing complexes violated those residents' Fourth and Fourteenth Amendment rights, and Vazquez-Valentin v. Santiago-Diaz, 459 F.3d 144, 146 (1st Cir. 2006), which considered, on remand from the Supreme Court, whether the district court erred in excluding certain evidence at trial in a case involving alleged political discrimination by the plaintiff's employers.

Connor, 490 U.S. 386, 389 (1989).  So, too, is the Supreme

Court's decision in Brower v. County of Inyo, which considered

whether police officers unreasonably seized a fleeing suspect

who died when he collided with a roadblock erected to stop his

flight.  See 489 U.S. 593, 594-95 (1989).

The sixth case, Kisela v. Hughes, 138 S. Ct. 1148 (2018)

(per curiam), warrants a bit more discussion.  In that case,

several police officers responded to a 911 report of a woman

hacking a tree with a kitchen knife.  Id. at 1151.  A few

minutes after the officers arrived at the scene, a woman

matching the description of the woman seen hacking the tree

emerged from a house carrying a large knife.  Id.  That woman

approached another woman standing near a car in the driveway,

stopping no more than six feet from her.  Id.  The officers drew

their guns and at least twice told the woman carrying the knife

to drop the weapon.  Id.  The woman standing near the car told

the officers and the woman carrying the knife to "take it easy."

Id.  The woman carrying the knife appeared calm, but did not

acknowledge the officers or comply with their commands to drop

the knife.  Id.  At that point one of the officers shot the

woman holding the knife four times.  Id.  The woman survived and

filed suit against the officer who shot her, alleging excessive

force.  Id.  In a per curiam opinion, the Supreme Court declined

to reach the constitutionality of the officer's conduct, holding

instead that he was entitled to qualified immunity because it was not clearly established that his conduct violated the Fourth Amendment.  See id. at 1152-55.

Short of supporting the Estate's contention that the officers violated Lambert's clearly established right in this case, Kisela stands as an indictment of that argument.  Whereas the plaintiff in Kisela was described as calm, there is no dispute in the present record that Lambert shouted expletives at the officers when the ordered him to drop the knife.  And unlike in Kisela, where the plaintiff was merely standing near a third party when she was shot, the Estate does not dispute that in this case Lambert was running at the officers when they opened fire.  The Estate's attempts to distinguish Kisela based on the size of the knife and Lambert's proximity to the officers when they shot him are unavailing, as the Estate points to no caselaw, controlling or otherwise, suggesting that those differences are material to the court's analysis.  Absent a case on point, the court fails to see how either distinction renders conduct that was not clearly unconstitutional in Kisela clearly unconstitutional in this case.

In addition to the above cases, the Estate also raises several factual arguments as to why Tarleton and Gudzinowicz are not entitled to qualified immunity.  While those arguments largely go to the first prong of the qualified-immunity analysis

(and are therefore immaterial to the outcome of this case), the court nonetheless addresses several of them here.

First, the Estate contends that the amount of time that passed from when the officers exited their vehicles to when they opened fire is disputed. To this end, the Estate asserts that Laura Ploss, a third-party eyewitness, stated during her interview with the New Hampshire State Police that Tarleton and Gudzinowicz discharged their weapons within six or seven seconds of exiting the cruiser, in contrast to the "less than 30 seconds" the officers estimated in their affidavits. But that is not exactly what Laura Ploss said: she stated that she saw the officers "get out of their car and put their hand on their weapon[s] right away . . . and then they drew their weapons right away and like six or seven seconds later we heard 'bang, bang, bang, bang, bang.'" Laura Ploss Interview at 2:44-2:59 (filed conventionally). In other words, Ploss stated that the officers opened fire six or seven seconds after they drew their weapons. It is therefore not clear that Ploss's statement is inconsistent with the officers' estimates in their affidavits. Yet, even if it were, the court fails to see how this inconsistency is material. Regardless of the exact time the officers opened fire, the Estate does not meaningfully dispute that Lambert was running at the officers with a knife when they

did so.  It is by no means "beyond debate" that using deadly force under such circumstances violates the Fourth Amendment.

The Estate also relies heavily on the dispute in the record as to how far Lambert was from the officers when they discharged their weapons.  This argument is likewise misplaced.  The Estate has not cited, and the court is unaware of, any caselaw suggesting that it <u>necessarily</u> violates the Fourth Amendment for an officer to shoot at a person running at that officer or one of his colleagues with a knife when that person is 10 to 15 yards away, as opposed to 10 to 15 feet.  Thus, while this discrepancy might arguably have some bearing on whether the officers' use of force was objectively reasonable, it does not make their conduct in this case clearly unlawful under the second prong of qualified immunity.

The Estate next argues that it was clearly excessive for the officers to continue firing at Lambert after he was initially shot.  This argument, too, is unavailing.  The record evidence, including a 911 audio recording in which the shooting can be heard in the background, supports the conclusion that the officers fired shots at Lambert in quick succession.  The Estate acknowledged at the hearing that it was unable to identify any case in which a court held that an officer violated the Fourth Amendment by firing multiple shots in quick succession at an individual running at that officer or his colleague with a

knife.[5]  The Estate has therefore failed to meet its burden of demonstrating that the manner in which the officers discharged their weapons in this case violated clearly established law.

In its objection, the Estate contends that there is a factual dispute whether the officers ever gave Lambert a verbal warning before shooting him.  At the hearing, the Estate revised this argument, conceding for the purposes of summary judgment that the officers did verbally warn Lambert, but challenging whether that warning was adequate.  While the First Circuit has held that an officer ordinarily must give a suspect some sort of warning before using deadly force against him, see McKenney v. Mangino, 873 F.3d 75, 82 (1st Cir. 2017) (citing Tennessee v. Garner, 471 U.S. 1, 11-12 (1985)), the key inquiry is whether the warning was "adequate in light of the circumstances then obtaining."  Conlogue, 906 F.3d at 156 (citing Young v. City of Providence ex rel. Napolitano, 404 F.3d 4, 23 (1st Cir. 2005)). There is no dispute in the record here that Tarleton and Gudzinowicz repeatedly commanded Lambert to stop and drop the knife before they opened fire.  The Estate points to no

---

[5] Given that the Supreme Court has cautioned courts analyzing excessive-force claims to be mindful that "police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation," Graham, 490 U.S. at 397, the court is skeptical that any such case exists.

authority suggesting that, despite these commands, the officers failed to adequately warn Lambert before they shot him. This argument is therefore also insufficient to meet the Estate's burden under the second qualified-immunity prong.

The Estate also spends considerable time focusing on Lambert's mental disability. And not without reason, as "the level of force that is constitutionally permissible in dealing with a mentally ill person differs both in degree and in kind from the kind of force that would be justified against a person who has committed a crime or who poses a threat to the community." Gray, 917 F.3d at 11 (citation and internal quotation marks omitted). But once again, this is an argument that goes to whether the officers' conduct was objectively reasonable, not whether that conduct violated a clearly established right. The Estate cites no authority, binding or persuasive, supporting the proposition that it is clearly unlawful for a police officer to shoot an individual running at him or another officer with a knife simply because that individual happens to be mentally disabled. Absent such authority, the Estate cannot overcome the clearly established prong by generally invoking Lambert's mental disability.

Finally, the Estate asks the court to draw an inference that Tarleton, Gudzinowicz, and McKenzie coordinated their stories. The court declines to do so. To defeat summary

18

judgment, a nonmovant must, "with respect to each issue on which he would he would bear the burden of proof at trial, demonstrate that a trier of fact could reasonably resolve that issue in his favor." Flovac, Inc. v. Airvac, Inv., 817 F.3d 849, 853 (1st Cir. 2016) (citation omitted). "This demonstration must be accomplished by reference to materials of evidentiary quality, and that evidence must be more than 'merely colorable.'" Id. (citations omitted). The court will not credit "conclusory allegations, improbable inferences, or unsupported speculation." See Fanning v. Fed. Trade Comm'n, 821 F.3d 164, 170 (1st Cir. 2016) (citation and quotation marks omitted) cert. denied, 137 S. Ct. 627 (2017). Here, the Estate points to no evidence that would transform its suggestion that the officers coordinated their stories from unsupported speculation to a reasonable inference the court must draw in the Estate's favor. The Estate's suggestion is therefore not one the court may accept at the summary-judgment stage.

    To its credit, the Estate acknowledged at the hearing that it had not identified any case in which conduct similar the conduct at issue here was found to violate the Fourth Amendment. But the Estate contended that it did not need to, as this was an "obvious case" where the unlawfulness of Tarleton and Gudzinowicz's actions was clear. The court does not agree. Without belaboring the point, it is by no means obviously

unlawful for a police officer to use deadly force against an individual who is running at that officer or his fellow officer bearing a knife. The Estate's counterarguments do not alter this conclusion; if anything, they demonstrate that determining whether the officers violated Lambert's rights in this case is necessarily a fact-intensive inquiry.

In sum, the Estate has not demonstrated that either Tarleton or Gudzinowicz violated Lambert's clearly established rights. The officers are therefore entitled to qualified immunity on the excessive-force claim. The court grants the defendants' motion for summary judgment as to that claim and dismisses the officers from this action.

**B.    ADA**

This leaves only the Estate's ADA claim against the Town. The Town contends that it is entitled to summary judgment on that claim both because the ADA does not apply to police investigations and arrests and because, even if it did, exigent circumstances justified the officers' conduct in this case. At the time the defendants filed their motion, the First Circuit had not addressed whether the ADA protections applied to police conduct during investigations and arrests. The defendants accordingly relied on persuasive authority, including decisions from other Courts of Appeals, to support their arguments. For its part, the Estate relied primarily on Justice Ginsburg's

20

concurring opinion in Tennessee v. Lane, 541 U.S. 509, 536 (2004), in arguing that the ADA extended to Tarleton and Gudzinowicz's actions.

Just last month, however, the First Circuit considered for the first time the interplay between the ADA and "ad hoc police encounters with members of the public during investigations and arrests." See Gray, 917 F.3d at 16. In its opinion, the court discussed the differing approaches other courts have employed when determining whether the ADA applied to police conduct. See id. at 16-17. Emphasizing that "courts should not rush to decide unsettled legal issues that can easily be avoided," the panel assumed without finding that the ADA applies to ad hoc police encounters, that a public entity can be held vicariously liable under the ADA for its employee's actions, and that proof of a defendant's deliberate indifference is sufficient to support a claim for damages under the ADA. See id. at 16-18. The court nevertheless concluded, in a fact-bound analysis, that the defendants were entitled to summary judgment because the plaintiff had not made out "a genuine issue of material fact as to [the officer's] deliberate indifference to the risk of an ADA violation." Id. at 18. In reaching this conclusion, the First Circuit declined to adopt, at least at present, much of the caselaw the defendants rely on in support of their motion. See id. at 15-17.

In the wake of *Gray*, the court cannot determine whether the Town is entitled to summary judgment on the ADA claim based on the current state of the briefing. Before taking a position on unsettled legal issues the First Circuit expressly declined to resolve as recently as last month, the court must be convinced that it has no choice but to do so. Yet without the benefit of the First Circuit's decision in *Gray*, neither party has addressed whether this case can be resolved on its facts. The court accordingly denies the defendants' motion without prejudice as to the ADA claim. The Town is granted 45 days to file a renewed motion for summary judgment, as may be appropriate, addressing the First Circuit's decision in *Gray*. If the Town does so, the Estate shall have 30 days to respond, as provided by Local Rule 7.1(b).

## IV.  CONCLUSION

For the reasons stated above, the court **grants** the defendants' motion for summary judgment on the excessive-force claim against Tarleton and Gudzinowicz and on the state-law claims against all three defendants. Tarleton and Gudzinowicz are dismissed as defendants. The court **denies** the defendants' motion **without prejudice** as to the ADA claim against the Town. The Town is granted 45 days to file a renewed motion for summary judgment on that claim, as may be appropriate, taking into

consideration the First Circuit's decision in <u>Gray</u>.  Should the

Town file a renewed motion, the Estate shall have 30 days to

respond, as permitted by Local Rule 7.1(b).  The August 6, 2018

Endorsed Order staying discovery and trial shall remain in

effect pending further order of the court.

    SO ORDERED.

                              _____
                              Andrea K. Johnstone
                              United States Magistrate Judge

March 25, 2019

cc:  Lawrence A. Vogelman, Esq.
     Charles P. Bauer, Esq.
     Weston Robert Sager, Esq.